**Pearl M. KENNEDY, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 86–1489.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 20, 1986.

Decided Nov. 13, 1986.

Franklin M. Haezell, Harzell, Glidden, Tucker, Neff & O'Neal, Carthage, Ill., for petitioner-appellant.

Patricia Bowman, Tax Div., Dept. of Justice, Washington, D.C., for respondent-appellee.

Before BAUER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

Pearl Kennedy acquired the family farm in two steps. She received a gift of a joint tenancy in 1953 when she and her husband Frank Kennedy acquired the farm. She received the remainder when Frank died in 1978, taking Frank's share by virtue of the survivorship feature that is part of joint tenancy in Illinois. In 1979 Pearl disclaimed the interest she had acquired by surviving Frank. Under the law of Illinois, Frank's former interest passed to the Kennedys' daughter Marsha. The IRS believes that the disclaimer is a taxable gift from Pearl to Marsha. See 26 U.S.C. §§ 2501, 2511. The Tax Court agreed, holding that Pearl's time to make a "qualified" disclaimer (one that avoids the imposition of tax) had been running since 1953 and therefore had expired long before Frank died. It relied on *Jewett v. CIR*, 455 U.S. 305, 102 S.Ct. 1082, 71 L.Ed.2d 170 (1982).

Frank's gift to Pearl in 1953 was taxable under the law then in effect. *Lilly v. Smith*, 96 F.2d 341 (7th Cir.), *cert. denied*, 305 U.S. 604, 59 S.Ct. 64, 83 L.Ed. 383 (1938); *Gutman v. CIR*, 41 B.T.A. 816 (1940).[*] Pearl received one-half of the value of the farm, reflecting the nature of the joint tenancy: an immediate, irrevocable one-half undivided interest, plus a right of survivorship in the other one-half. Although Pearl's life expectancy may have been longer than Frank's, making her the more likely beneficiary of the survivorship

feature, each also had an unfettered right under the law of Illinois to partition the property. *Harms v. Sprague*, 105 Ill.2d 215, 220–21, 85 Ill.Dec. 331, 333, 473 N.E.2d 930, 932 (1984). Partition by either spouse, or as part of divorce, would have ended the right of survivorship. Until one spouse died, it was not possible to say who (if either) would receive the survivor's share.

Pearl relies on this uncertainty in arguing that she did not acquire an interest in Frank's share of the property until Frank's death. On her reasoning the disclaimer therefore is governed by 26 U.S.C. § 2518, a provision added to the Code in 1976 and applicable to disclaimers properly made after December 31, 1976. The Tax Court held, however, that the transfer in 1953 started the time to disclaim under 26 C.F.R. § 25.2511–1(c) (1958), which applies to pre–1977 events and was at stake in *Jewett.* Regulation 25.2511–1(c) provides that only disclaimers "made within a reasonable time after knowledge of the existence of the transfer" are sufficient to avoid gift taxation, and the Tax Court believed that "the transfer" to Pearl took place in 1953. We are the first court of appeals to consider the appropriate treatment of disclaimed interests in real estate held through joint tenancies.

The IRS treats this as a replay of *Jewett.* That case involved four generations of Jewetts, which we designate by Roman numerals. Margaret Weyerhauser Jewett (Jewett I) died, creating a trust in which her spouse and children (Jewett II) had a life estate. On the death of the last life tenant, the corpus of the trust would go to surviving members of generation III. If the last life tenant survived any particular member of generation III, then that member's share of the corpus would go to generation IV, the children of the deceased member of generation III—if necessary, to the descendants of generation IV per stirpes. The trust was created in 1939,

---

[*] The Internal Revenue Code was amended in 1954 to create a special treatment of marital joint tenancies, see 26 U.S.C. § 2515 (repealed effective 1982). It now allows a deduction equal to the value of gifts to a spouse, see 26 U.S.C. § 2523(a) and (d). These changes do not affect our case.

when George Jewett, one of two members of generation III, was 11 years old. In 1972, while one member of generation II was still alive, George disclaimed any interest in the corpus of the trust. Under state law the trustee treated George as if deceased, making his children (Jewett IV) the direct beneficiaries of his half share of the corpus, then worth more than $8 million. The IRS proposed to levy a gift tax on the actuarial value of George's interest in the corpus—roughly $4 million multiplied by the probability that he would survive the last life tenant. George replied that until the last life tenant died, it was not possible to know who would receive the corpus, and therefore he could not be treated as owning, and giving to his children, such an uncertain interest. The Supreme Court held, to the contrary, that George's "interest" in the corpus was created in 1939, and unless disclaimed within a "reasonable" time thereafter would be treated as received by him and given to his children. The Court both sustained the regulation and accepted the Commissioner's interpretation of the regulation.

■ The rationale for both the regulation and the Court's disposition of *Jewett* is straightforward. A future interest is an element of current wealth. If in 1972 George Jewett had been the remainderman of a trust, with the corpus to be paid to him in 1992, the chance that he might die earlier would decrease the value of the interest but not make the interest worthless. If he had given the interest to his children he would have transferred real wealth. *Robinette v. Helvering*, 318 U.S. 184, 187 & n. 2, 63 S.Ct. 540, 542, 87 L.Ed. 700 (1943). A situation in which a person's interest depends on the relative longevity of several people is not fundamentally different from one in which only his own life span matters. In either case the future interest has a present value that can be computed from actuarial tables. In deciding whether to transfer the interest by disclaimer, the person will consider whether he wants to give that amount of wealth to the beneficiary of the disclaimer. George Jewett waited more than 20 years after reaching the age of majority to see whether it would be

prudent to pass an interest worth millions directly to his children; this is a substitute for giving wealth to his children from his other assets. He had the option to retain his interest in the wealth or to pass it on; he waited to see which was preferable in light of his income and wealth outside the trust. One who possesses such an option has the equivalent of a power of appointment. The exercise of a power of appointment by a person able to appoint assets to himself (that is, a general power) is a taxable gift by the person holding the power. 26 U.S.C. § 2514(b). The disclaimer in 1972 would have allowed George to assure his access to the wealth for an extended period and then to bypass a generation of transfer taxation, had it not been taxed as a gift.

Regulation 25.2511-1(c) and the 1976 statute treat a prompt disclaimer as collapsing the transaction into a single gift from the original owner to the ultimate recipient. A donee may refuse a gift without tax. A prompt disclaimer is a form of refusal that directs the gift to the donor's second choice. If George Jewett had disclaimed immediately on learning of his potential interest, it would be as if Jewett I's will had specified a transfer directly to generation IV on generation II's death. Whatever tax generations I, II, and IV should pay on this transfer, see 26 U.S.C. §§ 2601–22, a tax on generation III plays no logical role.

■ *Jewett* shows that a belated disclaimer may be a taxable gift even though the person disclaiming has no current access to the money and may never receive it. The IRS believes that this compels a conclusion that Pearl Kennedy had only a "reasonable" time after 1953 to disclaim and to have the transaction treated as a gift from Frank Kennedy to their daughter. The problem with this position is that the interests of the different generations of Jewetts were fixed in 1939. One could get out the actuarial tables in 1939 or 1972 and determine how much each person's share was worth. Frank's gift to Pearl in 1953 did not fix the rules for succession, however, because of the right to partition the property.

To see the difficulty, suppose the Jewett trust had given the last surviving member of generation II a general power of appointment and had provided that if she died without exercising the power, the corpus would be distributed exactly as the actual trust specified. Then it would have been impossible to value the interests in the trust in 1939 or at any time before the death of the holder of the power. The general power of appointment also would cause the value of the trust to be included in the holder's estate, see 26 U.S.C. § 2041(a)(2). In such a case the effective transfer occurs when the holder of the general power exercises it or lets it lapse, and the time to disclaim begins then.

This is how the regulations under the 1976 statute treat the situation. See 26 C.F.R. § 25.2518–2(c)(3), 51 Fed.Reg. 28365 (Aug. 7, 1986): "A person to whom any interest in property passes by reason of the exercise or lapse of a general power [of appointment] may disclaim such interest within a 9–month period after the exercise or lapse." The regulations treat other interests similarly. Suppose A and B create a joint checking account with right of survivorship, into which A places a sum of money. B may draw any or all of the money immediately, but so may A. The account by itself therefore gives B nothing; A's placement of money at B's disposal is revocable. The Commissioner treats a joint account as a transfer to B only when it becomes irrevocable—when B draws the money or A dies. If B does not withdraw the funds during A's life, B has nine months after A's death to disclaim any interest in the account. 26 C.F.R. § 25.-2518–2(c)(5) Example 9, 51 Fed.Reg. 28365 (Aug. 7, 1986).

The new regulations treat a survivorship interest in land as a completed, irrevocable gift on the date the tenancy itself was created, see 26 C.F.R. § 25.2518–2(c)(4)(i), 51 Fed.Reg. 28365 (Aug. 7, 1986). This is inconsistent with the Commissioner's treatment of general powers of appointment and joint bank accounts when, as is true in Illinois, either spouse may terminate the right of survivorship by partitioning the property. The regulations do not discuss the effects of a power to partition. Yet the prospect of partition means that only the one-half undivided interest has been transferred irrevocably; the survivorship interest may be withdrawn at will, just as funds in a joint account may be. Pearl had no greater interest in Frank's half of the farm than she did in any funds Frank deposited in a joint checking account. In either case Pearl would get the interest if she survived Frank, but only if Frank refrained from exercising his unfettered power to withdraw (or partition). There was no way to value the interest until Frank died. Cf. *Estate of Lidbury v. CIR*, 800 F.2d 649, 653–54 (7th Cir.1986) (a contract to make a gift is not a taxable gift when the value of the interest to be transferred is subject to diminution at the donor's pleasure). So Pearl's survivorship interest would have been treated as "worthless" in 1953 in valuing Frank's gift to her. See Gift Tax Regulations 108, §§ 86.2, 86.19(h) (1943). If the survivorship component of a joint tenancy were treated as a valuable gift in 1953, that would imply that Frank's retained interest was then worth less than half of the total value of the farm. After all, Pearl's share plus Frank's share must add to 100%. But Frank, too, had a right of survivorship, plus the half share that he could retain with certainty by partition. The Commissioner's treatment of the transfer in 1953 implies that Pearl got more than half of the value of the farm and that Frank kept more than half—which suggests that something is seriously wrong with the position.

Frank's power of partition was equivalent to a general power of appointment over Pearl's survivorship interest, because by partitioning the property Frank could direct his half to his creditors and legatees of his choice rather than Pearl. And joint tenancies cannot readily be used to skip a generation of taxes, because 26 U.S.C. § 2040(a) pulls the value of the property into the estate of a deceased joint tenant, just as a general power of appointment

pulls the value of the trust into the estate of the person who dies while holding the power. (Section 2040(b)(1) excludes certain "qualified" martial joint interests, but this exclusion should not influence the determination of the date of "transfer" for purposes of disclaiming, because the date selected will apply to joint tenancies other than marital ones.)

We therefore conclude that the gift of a joint tenancy with right of survivorship should be treated as more than one transfer in states that allow any tenant to partition the property at will. One transfer is an undivided interest, given on the date the tenancy is created. Additional transfers occur on the death of other joint tenants. This case, with two tenants, is simple. The time within which Pearl could disclaim the half of the property she received because of Frank's death started to run in 1978 and is therefore governed by the 1976 statute. The parties disagree about whether Pearl made a "qualified disclaimer" under the terms of § 2518 and the implementing regulations. The Tax Court should have the initial opportunity to apply these regulations to Pearl's disclaimer, and we remand the case for that purpose.

REVERSED AND REMANDED